**BRAGER & COMPANY, INC., Plaintiff,**

v.

**LEUMI SECURITIES CORPORATION, Bank Leumi le-Israel, B.M. and Bank Leumi Trust Company of New York, Defendants.**

**No. 76 Civil 4110.**

United States District Court, S. D. New York.

May 10, 1979.

Solin & Breindel, New York City, for plaintiff.

Reavis & McGrath, New York City, for Leumi Securities Corp. and Bank Leumi le-Israel, B.M.; Stephen R. Steinberg, Joseph A. Clark, III, New York City, of counsel.

Parker, Chapin, Flattau & Klimpl, New York City, for Bank Leumi Trust Co. of New York; Barry J. Brett, Stephen F. Harmon, Miriam Vogel, New York City, of counsel.

MEMORANDUM OPINION

EDWARD WEINFELD, District Judge.

 While the present state of the record suggests that the factual underpinnings

for plaintiff's Sherman and Clayton Act claims are somewhat shallow, which may account for the vigorous language of defendants in denying those charges, it must be remembered that the function of the Court under a Rule 56 summary judgment motion is to decide whether or not genuine issues of fact exist, and not to decide disputed fact issues.[1] Upon a close study of the extensive report of the Magistrate, the affidavits and briefs of the parties in support of their respective objections to specified recommendations in the report, and the voluminous submissions in support of and opposition to the underlying motions for summary judgment, the Court concludes that issues of material fact exist. Accordingly, the defendants' motion for summary judgment and plaintiff's cross-motion for partial summary judgment are denied.

In section II(D) of his report, the Magistrate enumerated and discussed numerous factual disputes touching virtually every essential element of plaintiff's multi-count complaint. Defendants contest the materiality of these issues, however, analyzing each of plaintiff's assertions in isolation in an attempt to expose the weakness of its case and dispel all adverse inferences. But the case must be decided upon the totality of the evidence. Thus, despite defendants' forceful challenge to plaintiff's proposed evidence of alleged deep pocket abuses, for example, it is for the fact finder to determine whether these were "normal" transactions between related entities, to weigh the significance of the time period in which the alleged subsidies occurred, and to consider their bearing on such issues as the existence of a conspiracy. In the same vein, the alleged threat to Brager to get out of the Israeli bond market—which defendants contend either never occurred or is a "quite unlikely event"—presents a material factual dispute bearing on the issue of anticompetitive intent.

Whether Leumi Securities conducted its Israeli bond business in a predatory manner also raises disputed issues—the conflicting data on the number of days on which Leumi Securities was the high bidder for bonds is but one example. In addition, the defendants' response to the charge of predatory pricing—that the essence of such conduct is the forgoing of short-term profits in expectation of monopoly benefits at a later date [2] —must be evaluated in light of the evidence that Leumi Securities was redeeming the bonds against equity purchases on the Tel Aviv Stock Exchange, rather than selling them in the secondary market. Whether the volume, rather than the fact, of such transactions was normal behavior for a market maker and the effect of this practice on present participants in and potential entrants to the market are material and disputed facts. The same observation may be made with respect to the significance of its inventory practices.

In some instances, defendants themselves have injected a factual dispute, as with the definition of the relevant product market. In attributing the growth in Leumi Securities' bond business to the increased issuance of bonds in the primary market after 1967, defendants included 4¾% and 5½% bonds in the market definition, whereas plaintiff has confined the market to 4% bonds.

On the issue of damages, while the plaintiff studiously avoided dealing with defendants' charges that its decline in business was essentially due to mismanagement on the part of Michael and Louise Abramoff, their misapplication of corporate funds for their personal benefit, and Brager's net cap-

1. *S. E. C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978); *Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir. 1975); *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975); *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972).

2. *International Air Indus. Inc. v. American Excelsior Co.*, 517 F.2d 714, 723 (5th Cir. 1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); *Telex Corp. v. International Business Machines, Inc.*, 510 F.2d 894, 926 (10th Cir.), cert. dismissed, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); Areeda & Turner, *Predatory Pricing Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975).

ital compliance difficulties, they do not, as the Magistrate noted, "logically exclude the possibility that some portion of the Brager financial decline has been caused by the antitrust abuses plaintiff seeks to prove." To the extent the alleged abuses, if established, were a concurrent cause of Brager's damages, the conduct of the Abramoffs even if proved could not be the predicate for summary judgment. In light of the thoroughness of the Magistrate's report, it is unnecessary to detail each disputed issue here. It is sufficient to note that no matter how vehemently defendants denounce the falsity of plaintiff's charges, stress the lack of evidence, or contend that the reasonable inferences to be drawn from the facts lie in their favor, material factual issues remain.

■ As to plaintiff's motion for partial summary judgment upon its claims of antitrust violation, these are so obviously riddled with sharply disputed fact issues that not only is the motion, as the Magistrate reported, "devoid of merit," but one must question whether it was made with any serious purpose or prospect of success.

■ There remains for consideration recommendations as to which Rule 56(d) is applicable. It is difficult to understand Brager's position that this Court reject those portions of the Magistrate's report which contain recommendations of undisputed facts. Thus in a somewhat cavalier manner its attorneys state that "Brager had no obligation to spend hundreds of hours combing through defendants' submissions and controvert each and every fact." Indeed it did have that obligation, just as this Court was not relieved of its obligation to study the massive papers and documents submitted by the parties, much of it a trad-

ing of charges and counter-charges without relevance to the issues. If plaintiff had "no obligation," then Rule 56(d) is without meaning or purpose.[3] However, the need for the Rule is emphasized by this case, where the pretrial procedures and motions have accumulated thousands of pages of testimony and documents. The papers on the summary judgment motion exceed 1000 pages. It would serve to streamline the factual aspect of a predictably long trial if clearly undisputed facts recommended by the Magistrate were adopted. Accordingly, the Court accepts and finds, pursuant to Rule 56(d), that the recommendations enumerated in the attached appendix are material facts without substantial controversy and shall be deemed established upon the trial. These shall be incorporated in the pretrial order as undisputed facts and the parties are directed to enter a pretrial order no later than twenty days from date.

### APPENDIX

I. The following paragraphs of the Magistrate's Report, which were not specifically objected to by either party, shall be incorporated into the pretrial order:

1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31a, 32, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46a, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 65, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82, 83, 84, 85, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 100, 100a, 102, 103, 104, 105, 106, 107, 108, 109, 110, 113, 114, 117, 119, 120, 121, 122, 130, 131, 132, 135, 137, 138, 139, 140, 141, 142, 144, 145, 146, 147, 148, 149, 152, 153, 154, 157, 158, 159, 160, 161, 162, 163, 164.

**3.** As the Advisory Committee Notes to Rule 56 indicate, the adjudication contemplated by Rule 56(d) "is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *See Dundee Wine & Spirits, Ltd. v. Glenmore Distilleries Co.*, 238 F.Supp. 283, 290 (S.D.N.Y.1965); 6 J. Moore, Federal Practice (pt. 2) ¶ 56.20[3. –3], at 56.1223.

An additional reason Brager advances for opposing Rule 56(d) treatment of the Magistrate's

Recommendations is that no hearing on the summary judgment motions was held. However, it was only with the parties' consent that the motions were taken on submission. Moreover, local rules allowing a district court in its discretion to dispense with oral argument have been held not to be in conflict with the Rule. *See, e. g., Spark v. Catholic Univ. of America*, 167 U.S.App.D.C. 56, 59, 510 F.2d 1277, 1280 (D.C.Cir. 1975); *Parish v. Howard*, 459 F.2d 616, 620 (8th Cir. 1972).

II. The following paragraphs of the Magistrate's Report shall be incorporated into the pretrial order as modified herein:

¶ 31 Both before and after the decision to withdraw from American securities and American market activities in or about 1970, Leumi Securities made and continues to make vigorous efforts to interest American investors in making equity investments in Israel. In this regard, Leumi Securities has and continues to expend considerable time, effort and money in connection with the servicing and formation of investment clubs which are interested in purchasing Israeli securities traded on the Tel-Aviv Stock Exchange.

¶ 33 In August 1974, Mr. Japhet, who was then the Chairman of Leumi-Israel, expressed his concern in writing that Leumi Securities was becoming a "monoculture" dealing almost exclusively in bonds.

¶ 34 In 1974, and continuing through 1975 and 1976, the Israeli securities business continued to decline. The financial results of Leumi Securities reflect these changes that occurred in the market. Whereas in earlier years, Leumi Securities' revenues came mostly from areas other than Israel bonds, beginning in 1973, trading profits from Israel bonds became a more significant part of Leumi Securities' earnings picture. Leumi Securities' results for 1973, 1974, 1975 and 1976 were:

[quote remainder of ¶ 34]

¶ 46 In 1974 and 1975, Leumi Securities paid Leumi-Israel, its sole stockholder, a dividend of $70 per share, totalling $35,000 per year. [Olivestone Aff. ¶ 221].

¶ 60 During Mr. Engel's tenure with Brager, it had a line of credit of $300,000 with American Bank & Trust Company; had a line of credit or received loans from the Israel Discount Bank as high as $400,000; and had a line of credit with Leumi-Israel's then New York branch of at least $365,000.

¶ 69 The amount of Brager's net capital restricted the amount of Israel bond inventory that Brager could acquire and maintain. Commencing in 1973, Brager had difficulties maintaining the minimum amount of net capital necessary for it to remain in business.

¶ 78 In March 1973 Messrs. Engel and Abramoff resolved their differences in various agreements pursuant to which Mr. Abramoff purchased Mr. Engel's Brager shares. In or about March or April 1973, Brager's request for a line of credit with the Israel Discount Bank was denied; the Bank decided to proceed for the immediate future on an offering basis. [Olivestone Aff. Ex. 69 at pp. 112–14; Ex. 70]. Brager's regular line of credit of $400,000 had been lapsed due to the change in management of Brager. [Ex. 70].

¶ 86 The East 80th Street brownstone is also the residence of Mr. and Mrs. Abramoff, who occupy two floors of that building. They pay no rent, gas, or electricity.

¶ 87 During 1973 Brager's net worth decreased by $336,484. It had a loss of $328,195, almost one-third of which resulted from Brager's trading in American securities. Louise Abramoff's trading account for 1973 showed a loss of $73,881.34. [Olivestone Aff. Ex. 121 at pp. 100–102].

¶ 98 In or about early 1974 the certified public accounting firm of Teichner & Swerlin, issued a qualified year-end financial

statement for Brager for the period ending December 1973. In a letter to the Securities and Exchange Commission accompanying the financial statement, Mr. Teichner stated that the report was a qualified one "due to the lack of response to our confirmations." [Olivestone Aff. Ex. 151].

¶ 99 In or about the Spring of 1974 Leumi-New York requested Brager to furnish it with the year-end balance sheet for the period ending December 1973. However, Brager did not submit this qualified statement to Leumi-New York and its account was closed in or about May 1974.

¶ 101 After Brager's current management learned of the defendants' alleged conspiracy to take over the Israel secondary bond market, (i. e., April 1973), in October and November 1974 Mr. Abramoff, in sworn statements, attributed the damage to Brager's business to Nathan Engel and the Japhet Bank.

¶ 123 In 1973 Brager's offices were moved to 12 East 80th Street, New York, New York, notwithstanding the fact that Brager had recently moved from Wall Street to 767 Fifth Avenue. The landlord of Brager's new building was and remains today Milo Real Estate Corporation, an entity which was then owned and controlled by Louise Abramoff and Meyer Abramoff, Michael Abramoff's father. Brager had no lease with Milo Real Estate Corporation but nevertheless from time to time made substantial prepayments of rent even though Brager was at those times having problems in maintaining sufficient net capital to comply with the net capital rules of the NASD.

¶ 124 The Abramoffs occupy two floors of the building where Brager is located. They pay no rent nor do they pay for the use of any gas or electricity. The Abramoffs substantially increased Brager's expenditures for furniture, fixtures and travel and entertainment. Moreover, they obtained a loan from the Chase Manhattan Bank in favor of Milo Real Estate Corporation which was secured by a certificate of deposit belonging to Brager.

¶ 126 In the fall of 1975, American Bank & Trust Company discovered that Brager was in the possession of a "signature guarantee" stamp belonging to the bank and that the name of a bank officer was being affixed to that stamp without the bank's knowledge or approval. Brager was informed of these facts; it was requested to return the stamp, which it did, and the bank thereupon terminated Brager's line of credit and demanded repayment of the then outstanding loans. [Olivestone Aff. Ex. 133].

¶ 127 Brager, while managed by the Abramoffs, was under the constant supervision of staff members of the NASD. An NASD staff memorandum dated July 15, 1974, stated: "Based on the past month's dealings with Mr. Abramoff, the staff is unable to decide whether he is deliberately withholding information or simply incompetent to fill the role of financial principal."

¶ 136 Leumi-New York charges Leumi Securities for services that may be performed by Leumi-New York on behalf of Leumi Securities and Leumi Securities in fact makes such payments. Thus, for example, in connection with the operation of Leumi Securities' account at Leumi-New York, at times Leumi-New York has had to send telexes on behalf of Leu-

mi Securities and Leumi Securities was charged for the same even though such charges were of a minimal nature.

¶ 150 In discussions and correspondence with the NASD staff in 1973, Abramoff attributed Brager's net capital difficulties to the $75,000 indebtedness, losses from trading in American securities, and the inventory position of Brager in certain Israel securities. [Olivestone Aff. Ex. 123, 136].

¶ 151 Louise Abramoff, Brager's trader, testified that she did not know whether Brager paid higher or lower prices, on any given day, than any other broker in the secondary market. [Olivestone Aff. Ex. 93].

III. The following paragraphs of the Magistrate's Report, although objected to by plaintiff, shall be incorporated into the pretrial order without modification:

¶ 115 This paragraph refers to the period 1962–1965; the subsidies alleged by Brager occurred subsequent to this period.

¶ 125 Plaintiff objects that there is no evidence that the transactions engaged in by Mr. Abramoff were not in part for Brager's dispute. However, one source of dispute between the NASD and Brager concerned the $75,000 liability recorded on Brager's books which Abramoff described to the Israel Discount Bank as "his own personal debt to the Japhet Bank" [Olivestone Aff. Ex. 126] and as representing "his personal purchase of the stock of H. Kook & Co., Inc. from Hillel Kook. The sale was effected through the Japhet Bank in Israel who requested that Brager & Co. be responsible for the debt." [Id. Ex. 127]. As for Mrs. Abramoff, she and Meyer Abramoff owned and controlled Milo Real Estate Corporation, an entity that used a Brager $25,000 certificate of deposit as collateral for a loan in the same amount. [Id. Ex. 116; see also Ex. 160, p. 5].

¶ 134 The evidence proffered by plaintiff in opposition to this recommended finding may be relevant for other purposes but it does not raise a triable issue concerning "subsidies" by Leumi-New York to Leumi Securities.

¶ 143 When asked to what degree he had been involved in the secondary bond market since March 1971, Mr. Abramoff testified, "I owned, through H. Kook & Co., shares in Brager & Co." When asked if he was involved in the market to any other extent, he replied, "As a student." [Olivestone Aff. Ex. 92, pp. 1376–77]. This testimony and his affidavit statement that he had a "knowledge" with respect to Israel bonds subsequent to 1971 do not raise a triable issue as to Abramoff's involvement in Brager's trading of Israel bonds.

¶ 155 Plaintiff's objection to this paragraph is entirely speculative.

¶ 165 In asserting there is no evidence to support this paragraph, plaintiff overlooks Engel's testimony. [Olivestone Aff. Ex. 20 at pp. 109, 116].