**William G. MESCHINO, Plaintiff,**

v.

**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Defendant.**

**No. 81 Civ. 3588 (CES).**

United States District Court, S.D. New York.

April 19, 1983.

Lane, Felcher, Kurlander & Fox, New York City, for plaintiff; Pamela Davis, New York City, of counsel.

Solin & Breindel, New York City, for defendant; Marl L. Wyman, New York City, of counsel.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff William G. Meschino ("Meschino"), a former employee of defendant International Telephone and Telegraph Corporation ("ITT"), brings this action for violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"). The gravamen of Meschino's claims is that in violation of the ADEA he was fired for reasons stemming from age discrimination. ITT contends that Meschino was not let go for reasons stemming from age discrimination, but rather was "terminated" along with other employees as part of a cost cutting effort by senior management. In support of its contentions, ITT has moved for summary judgment as to Meschino's age discrimination and willful age discrimination claims and for dismissal of his pendent state and compensatory damages claims. Discovery has been completed by both sides.

## Background

At the time of his dismissal in July 1980,[1] Meschino was employed at ITT's corporate headquarters in New York as one of six persons holding the title "Manager-Staff Operations." At age fifty-eight, Meschino was the oldest executive in Staff Operations. In January 1979, John Foley, a Vice President of ITT, became director of the Operations Staff Department of which Staff Operations was one unit. That month, Foley formulated plans to reduce the number of executives in the Operations Staff Department. A year and a half later, Meschino was fired. There is no indication that any other Manager-Staff Operations was let go during the three year period in which Foley carried out his executive work force reduction plan for the Operations Staff Department. On or about July 1, 1980 Garet M. Romeo, then forty-one years old, was hired as a Manager-Staff Operations.[2]

## Summary Judgment

■ To evaluate whether ITT is entitled to summary judgment, it is necessary to consider the burdens of proof borne by each side in an age discrimination suit. Under ADEA, the presentation of proof has three steps:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportu-

nity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Pena v. Brattleboro Retreat* [702 F.2d 322], No. 82–7598, slip op. at 2131 (2d Cir. Mar. 1, 1983) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 [101 S.Ct. 1089, 1093, 67 L.Ed.2d 207] (1981)).

The failure of a party at trial to meet its burden with regard to any of these steps is dispositive. *See Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914 (2d Cir.1981). For purposes of defendant's summary judgment motion, the only difference occurs at step three where, to prevail on its motion, it "must show that no genuine issue of material fact exists as to its ability to establish a non-discriminatory reason [for Meschino's dismissal]." *Reich v. New York Hospital,* 513 F.Supp. 854, 860 (S.D.N.Y.1981). *See* Fed.R.Civ.P. 56. In determining whether a genuine issue of material fact exists, the court is to resolve all ambiguities and draw all reasonable inferences against the moving party. *Hill v. A–T–O, Inc.,* 535 F.2d 1349, 1354 (2d Cir.1976); *Sterling National Bank and Trust Co. of New York v. Fidelity Mortgage Investors,* 510 F.2d 870, 875 (2d Cir.1975). Following this approach, we conclude that summary judgment is inappropriate in this case.

■ Meschino satisfies his initial prima facie case burden by demonstrating that (1) he was fifty-eight years old when fired and therefore within the protected age group,[3] (2) he was qualified for his job at the time of his dismissal,[4] and (3) a person considerably younger, age forty-one, was hired to assume his responsibilities.[5] *See Stanojev*

---

1. According to Defendant's Statement of Material Facts under Local Rule 3(g), "Meschino received his notice of termination from ITT on July 15, 1980," but it appears that he may have been orally informed that his employment was being terminated on July 8, 1980. Complaint, ¶ 10.

2. Romeo apparently accepted the position in May 1980 but did not start right away.

3. The protected age class under ADEA consists of persons forty to seventy years old. 29 U.S.C. § 631(a) (Supp. IV 1980).

4. The parties do not dispute that Meschino was well qualified for his position. *See* note 6 *infra.*

5. ITT argues that Romeo did not actually replace Meschino since his duties were broader than Meschino's, but that even if he did, since Romeo was forty-one years old and within the protected age group under ADEA himself, his

v. *Ebasco Services, Inc.*, 643 F.2d 914, 919–20 (2d Cir.1981).

ITT, in turn, has met its burden of articulating a nondiscriminatory reason for Meschino's dismissal by asserting and making some showing to the effect that Meschino's discharge was part of a reorganization plan aimed at economy and improved performance. Thus, the third step, whereby ITT as the moving party has the burden of showing there is no genuine issue as to its motive in firing Meschino, is crucial to the outcome of this motion.

ITT claims it is entitled to judgment under Rule 56 insofar as the essential facts are not in dispute and necessarily compel the conclusion that Meschino was fired for nondiscriminatory business reasons. Under Local Rule 3(g) the following facts which ITT asserts to be of relevance may be deemed established. During a three year period from January 10, 1979 to December 31, 1981, the Operations Staff Department in which Meschino had been employed was reduced from 53 persons to 27 persons. During the same three years the average age of executives in this department increased. Meschino was fired in July 1980, during this period. Of the six persons holding "Manager-Staff Operations" positions on June 30, 1980, Meschino had the lowest rating on the most recent performance evaluation prior to his dismissal[6] and also had the lowest salary grade and salary.[7]

■ There is no doubt that these facts create an inference that ITT's motive for

discharging plaintiff was legitimate. The ADEA does not prohibit an employer from discharging an employee for genuine business reasons or for good cause. *See* 29 U.S.C. § 623(f). Thus, if plaintiff were at this point to put forward no evidence creating a contrary inference—and thus a triable issue—we would be constrained, as defendant urges, to grant defendant's motion. *See, e.g., Nash v. Cochran, Inc.*, 548 F.Supp. 676 (S.D.N.Y.1982).

This is not the case, however. Primarily through the deposition of Jules Berke who was Vice President and Director of Operations Planning Review and Control at ITT when Meschino was fired, and who personally fired Meschino at the behest of John Foley, plaintiff shows that a triable issue as to ITT's motive does exist.

■ In reaching this conclusion, we note at the outset that Meschino's case is not precluded by a finding that a work force reduction was indeed in progress. An ADEA plaintiff is "not required to show that age discrimination was the *sole* cause of [his] discharge." *Geller v. Markham*, 635 F.2d 1027, 1035 (2d Cir.1980) (emphasis in original). All he must show is that age was the "determinative factor" in *his* being singled out for dismissal. *See id.* Here it is undisputed that within a few weeks of his taking office in January 1979, John Foley made a decision, which he later put into action, to cut his staff back. The question is whether in carrying out this plan ITT may have chosen Meschino as a candidate

---

replacement of Meschino can not be cited to help establish a prima facie case. With regard to the first point it is clear that Romeo was hired as a Manager-Staff Operations. *See, e.g.,* Romeo Dep. at 3–4. Further even if Romeo ultimately came to fill two consolidated positions, as ITT in effect contends, a prima facie case will still be found if one of the two replaced employees was in the protected age group. *See Williams v. General Motors Corp.*, 656 F.2d 120, 128 (5th Cir.1981) ("Even in the absence of a one-for-one replacement of an older employee by a younger one, an employer can, with marked facility, practice age discrimination in a reduction-in-force scenario.")

With regard to the second point, we see no reason to impose an absolute rule that the discharged employee be replaced by someone

outside of the protected class to establish a prima facie case of age discrimination. Where the replacement employee is some seventeen years younger than the discharged employee, such a rule would be unduly rigid. *Accord McCorstin v. U.S. Steel Corp.*, 621 F.2d 749 (5th Cir.1980); *Moore v. Sears, Roebuck and Co.*, 464 F.Supp. 357 (D.Ga.1979).

**6.** According to the rating system, Meschino was an employee whose "contribution is very valuable; high overall performance," notwithstanding the fact that no other Manager-Staff Operations had a lower rating.

**7.** It is not clear why ITT asserts this to be relevant.

for discharge for reasons related to age bias.

■ The testimony of Jules Berke permits an initial inference that in choosing who should stay and who should go Mr. Foley may have relied more on his impressions or feelings than on detailed evaluation. This inference is raised by the fact that Foley was able to decide on a group of people to let go within a rather short time after he assumed his new office.[8] The inference is supported with regard to Meschino by the following testimony from Berke:

Q What was the discussion between yourself and Mr. Foley regarding Mr. Meschino being a candidate for reduction in staff?

A Essentially Mr. Meschino was a sleepy kind of guy, droopy with no pizazz and he didn't think he was a particularly effective operation staff executive. My position was that it's true that Meschino gave that impression but, in fact, he was a rather competent fellow who had demonstrated his ability over the years and that surface impression was really misleading.

Q At the time Mr. Foley expressed that opinion to you, do you have any knowledge of the extent to which Mr. Foley and Mr. Meschino had dealt with each other?

A I don't think it was extensive at all.

Berke Dep. at 10.

* * * * * *

Q Well, I wanted to understand what you meant when you characterized Mr. Foley's opinion of Mr. Meschino as being subjective?

A I think it was in the context of my statement that he really didn't have

much to do with the people that he had identified should leave so, therefore, I concluded it was somewhat subjective. Whereas, myself and others having had a long exposure to Bill's performance, I would characterize it as subjective but on the other hand, it was based on material that we had observed over the years.

Q You had more occasion to deal directly with Mr. Meschino than Mr. Foley, correct?

A Oh, yes, I would say so.

Berke Dep. at 58.

The inference that Foley relied on his impressions is strengthened by evidence that he may have been mistaken as to Meschino's ability to carry out specific responsibilities.[9] This inference would in itself be harmless except that it dovetails with Foley's apparent description of Meschino as "a sleepy kind of guy, droopy with no pizazz," or as Berke testified at another point, as "old and tired." Berke Dep. at 75–76. Such descriptions are consistent with discriminatory stereotypes of older people suggesting that Foley's "impression" of Meschino could have been rooted in age bias. Meschino points to additional evidence which makes what otherwise might be a rather speculative inference of age bias significantly more concrete. Mr. Berke's deposition further relates that Berke heard Rand Araskog, the Chief Executive Officer and Chairman of ITT, announce at a "general manager's meeting" that the managers "had to bring [in] younger blood, younger executives, change the mix," and also heard Foley echo this goal on a number of occasions. Berke Dep. at 37–38. *See also id.* at 78. Moreover, when asked why Foley "felt

---

8. Berke's testimony was that Foley had identified an initial group to be fired in the early months of 1979, or within just a month or two of Foley's taking over control of the Operations Staff Department. Berke Dep. at 7. Foley does not recall precisely when this occurred. Foley Dep. at 7. Although Meschino was not fired until July 1980, he was within the group initially identified for dismissal. Foley was apparently persuaded not to let Meschino go in the first round of cuts. Berke Dep. at 60.

9. Plaintiff's exhibits, for example, show that Meschino received high ratings from people who knew his work well in areas in which Foley thought Meschino to be a poor performer. While it is true that a determination of the soundness of Foley's business judgment is irrelevant in a suit under ADEA, *see Nash v. Jacqueline Cochran, Inc.,* 548 F.Supp. 676, 681 (S.D.N.Y.1982), it is also true that a professional business judgment may mask age discrimination. A jury may therefore examine the purported business decision to see if it has the aroma of pretext.

it was necessary to have any cutbacks" Berke testified, "I'm sure that it had to do with Mr. Araskog's desire to get a smaller headquarters group and a younger mix of people.... It seemed to be a thing that Foley wanted to do to conform to what he perceived to be Araskog's designs." Berke Dep. at 55.

Berke testified as to two other occasions when Foley made statements indicating his thinking might have been tainted by age bias:

Q To your knowledge, did Mr. Foley ever take any action to manifest that sentiment?

A Oh, yes, he was very anxious to bring younger people into the group. As a matter of fact he would have loved to replace Jerry Smith [an outgoing employee] with a younger person. He wanted a 35-year-old tiger. Unfortunately, we couldn't find any.

Q Was that Mr. Foley's expression?

A Yes, words to that effect.

Berke Dep. at 38.

\* \* \* \* \* \*

Q Were you aware that there were some people on Mr. Schaffer's staff that were terminated—

A Yes.

Q —by Mr. Foley?

A Yes, or by Mr. Schaffer at Mr. Foley's instructions.

Q This was all in the 1979 to 1980 time period, right?

A Yes, I believe so.

Q Do you know what the reason was for those terminations?

A I recall Mr. Foley saying on occasion that the average age in Schaffer's group was something like 60 years old or something like that and it was a terrible problem and they really had to do something about it.

Berke Dep. at 79.

This testimony provides precisely what was missing in two recent cases in which District Judges of this Court granted summary judgment in favor of ADEA defendants. *Nash v. Jacqueline Cochran, Inc.,* 584 F.Supp. 676 (S.D.N.Y.1982) (Weinfeld, J.); *Reich v. New York Hospital,* 513 F.Supp. 854 (S.D.N.Y.1981) (Sofaer, J.). In *Nash,* for example, Judge Weinfeld noted "there must be some basic evidentiary fact to permit the trier of fact to draw a reasonable inference of intent to discriminate" if summary judgment is to be forestalled. Among the means by which this requirement may be met, Judge Weinfeld held, would be the production of "any evidence that any responsible company official stated a preference to retain younger employees in effecting eliminations that were required under reorganization." Construing all reasonable inferences in favor of the nonmoving party, as we are bound to do, *Hill v. A–T–O, Inc.,* 535 F.2d 1349, 1354 (2d Cir. 1976), we think the statements as testified to by Berke can easily be read to suggest such a preference. These statements, coupled with Meschino's prima facie case and other circumstantial evidence, show that there is a triable issue as to whether Meschino's dismissal was grounded in illegal age discrimination.

ITT's contrary contentions notwithstanding, it is clear that Berke's testimony as to ITT executive's statements would not be inadmissible hearsay at trial, since the out of court statements would be offered to show the defendant's state of mind, *see* Fed.R.Evid. 803(3), and would be offered against a party. *See* Fed.R.Evid. 801(d)(2). ITT argues that Foley's and Araskog's statements, if in fact made, are merely "truisms" reflecting either the point of view that it is desirable to have "young executives grow with the company," or the observation that young employees "will make up the next generation of management." Def. Mem. in Support at 15–16. But such arguments only highlight the reason we conclude that a triable issue exists, namely, that the parties make plausible and differing arguments over what was intended. Whether the statements in question comprise a "smoking gun" evidencing a policy of age discrimination or are wholly innocuous is largely a question of credibility, an issue properly left for trial. ITT's age

statistics, while perhaps bearing on the issue of credibility, can not dispose of Meschino's claim that he personally was discriminated against. It is entirely possible, for example, that ITT had a policy of squeezing out older employees but, for one reason or another, was unable to implement that policy in very many instances. Accordingly, ITT's motion as to Meschino's age discrimination claim must be denied.

We reach the same conclusion with regard to Meschino's "willful age discrimination" claim. A willful violation under the ADEA occurs when "the defendant acted with knowledge of the illegality of his action." *Koyen v. Consolidated Edison Company of New York*, 560 F.Supp. 1161 at 1165 (S.D.N.Y.1983). Berke's deposition testimony indicates that if indeed Foley's discharge of Meschino was violative of ADEA, Foley had reason to be aware of its unlawfulness:

Q Did there come a time when you formed the opinion that Mr. Meschino was contemplating a lawsuit against ITT?
A Yes.
Q When was that?
A After he was let go.
Q Did there come a time when you expressed that opinion to Mr. Foley?
A Yes.
Q When was that?
A I think in the course of our conversations, I indicating to him that Meschino was 59 years old and that he ought to be very careful about what he does about this situation because we could be subject ourselves to a lawsuit.
Q Was this prior to your informing Mr. Meschino?
A About his termination you mean?
Q Yes.
A Oh, yes.
Q Do you recall Mr. Foley's response?
A Other than he didn't accept the idea.
Berke Dep. at 50–51.

This we deem sufficient to support an inference that Foley could have acted with knowledge of the illegality of his actions, assuming his actions were illegal.

ITT also moves for an order pursuant to Rule 56(d) seeking to have the court make findings as to which material facts are in dispute and which are not. The purpose of Rule 56(d) is to limit the scope of the trial by removing "sham issues from the case." 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* 457–59 (1983). Thus the Rule is employed when the evidence before the court on the summary judgment motion is vast and complex and findings of fact would help "salvage some results from the judicial effort involved in the denial of [the] motion for summary judgment." *Id.* at 459 (quoting *Yale Transportation Corp. v. Yellow Truck & Coach Manufacturing Co.*, 3 F.R.D. 440, 441 (S.D.N.Y.1944)). *See e.g., Brager & Co. v. Leumi Securities Corp.*, 84 F.R.D. 220 (S.D.N.Y.1979). Here, ITT wishes us to make findings as to facts a majority of which have been admitted under Local Rule 3(g). Insofar as these facts will have to be introduced in some form or another at trial and are not contested, a Rule 56(d) order establishing their existence would neither remove "sham issues" nor "limit the scope of the trial." We think it will be less confusing for the jury if these facts are established at trial in the normal presentation of evidence by both sides.

### Compensatory Damages and the Pendent State Claim

ITT also moves to dismiss Meschino's pendent state law claim as well as his federal claims insofar as they assert "physiological and psychological damages." Meschino asserts he sustained such damages by reason of his discharge. Neither the Second Circuit nor the Supreme Court has as yet decided whether damages of this nature are available under the ADEA. Although there are persuasive arguments to the contrary, *see Pavlo v. Steifel Laboratories, Inc.*, 22 Fair Empl.Prac.Cas. (BNA) 489, 492–94 (S.D.N.Y.1979), we join with the vast majority of courts in holding that the ADEA does not permit compensatory damages for what amounts to pain and suffer-

ing.[10]  The reasons for so holding have been amply stated in the prior decisions.

Meschino argues, however, that even if the ADEA does not permit compensatory damages, his pendent state claim under N.Y.Exec.Law § 296 *et seq.* (McKinney 1982) (prohibiting employment discrimination) does permit the award of such damages.  While it is true that damages for pain and suffering are available under New York's employment discrimination law, *see Batavia Lodge No. 196 v. State Division of Human Rights,* 35 N.Y.2d 143, 316 N.E.2d 318, 359 N.Y.S.2d 25 (1974), it is not clear that plaintiff's state law claim is properly before us.  The problem is that by complying with the ADEA's prerequisites for bringing the ADEA claim in court, a plaintiff necessarily runs afoul of the state's procedural requirements for bringing the state employment discrimination claim in court.

▮ A prerequisite to bringing an ADEA claim is that the plaintiff file a complaint with the appropriate state agency having "authority to grant or seek relief from such discriminatory practice."  29 U.S.C. § 633(b) (1976).  *See Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979); *Reich v. Dow Badische Co.,* 575 F.2d 363, 369–70 (2d Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).  It is not disputed that the plaintiff here made a timely filing of the requisite complaint before the New York State Division of Human Rights ("HRD").  New York Executive Law section 297 governs the procedure under which a section 296 state employment discrimination claim may be made.  Subdivision (9) of section 297 states:

    9.  Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate, *unless such person had filed a complaint hereunder* or with any local commission on human rights, or with the superintendent pursuant to the provisions of section two hundred ninety-six-a of this chapter, provided that, where the division has dismissed such complaint on the grounds of administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed. . . . (emphasis added).

▮ The "complaint" referred to in the clause "unless such person had filed a complaint hereunder" is a complaint before the HRD.  *See* N.Y.Exec.Law § 297(1) (McKinney 1982).  Thus, section 297 sets up an election of remedies procedure.  Persons seeking redress of employment discrimination under state law may either bring their claim in an appropriate court, or file a complaint before the HRD; but they may *not* do both.  "Stated simply, the remedies are mutually exclusive."  *West v. Technical Aid Corp.,* 111 Misc. 23, 24, 443 N.Y.S.2d 318, 320 (Sup.Ct.1981).  *See Emil v. Dewey,* 49 N.Y.2d 968, 406 N.E.2d 744, 428 N.Y.S.2d 887 (1980).  Construing the ADEA and the state statute literally, their combined effect seems to be that a plaintiff may not bring a court action asserting both federal and state age discrimination in employment claims.  The one exception to this would-be rule is that under section 297(9) a plaintiff is not barred from bringing a subsequent court action on his state law claim if his HRD complaint has been dismissed "on the grounds of administrative convenience."  Here, plaintiff has apparently requested that the HRD dismiss his claim "for administrative convenience."  While it is not clear that a dismissal in response to such a re-

---

**10.**  We note for example that every circuit court to address this issue has found that damages for pain and suffering are not available under the ADEA.  *See Pfeiffer v. Essex Wire Corp.,* 682 F.2d 684 (7th Cir.), *cert. denied,* — U.S. ——, 103 S.Ct. 453, 74 L.Ed.2d 606 (1982); *Fiedler v. Indianhead Truck Line, Inc.,* 670 F.2d 806, 809–10 (8th Cir.1982); *Naton v. Bank of California,* 649 F.2d 691 (9th Cir.1981); *Slatin v. Stanford Research Institute,* 590 F.2d 1292 (4th Cir.1979); *Vazquez v. Eastern Airlines, Inc.,* 579 F.2d 107 (1st Cir.1978); *Dean v. American Security Insurance Co.,* 559 F.2d 1036 (5th Cir.1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); *Rogers v. Exxon Research & Engineering Co.,* 550 F.2d 834 (3rd Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978).

quest would qualify as a dismissal for administrative convenience, *see Emil v. Dewey,* 49 N.Y.2d 968, 406 N.E.2d 744, 428 N.Y. S.2d 887 (1980), we think it appropriate to resolve the question of whether the administrative convenience exception has been met, and not attempt, at this point, to determine whether the convergence of state and federal law should be read to produce the anomalous result a literal reading seems to yield. Since we have no record of the final disposition of the HRD complaint, if any, we are unprepared to rule on the administrative convenience exception question at this time.

Accordingly, we defer a decision on defendant's motion to dismiss plaintiff's pendent state law claim. Plaintiff will have ten days from the date of this decision to submit evidence of the current status of the HRD complaint and any arguments he may wish to make with respect to the issue in question. Defendant will then have five days to respond. Defendant's motion for summary judgment is denied in all respects.

SO ORDERED.