Dayton BERNSTEIN, et al., Plaintiffs,

v.

CONSOLIDATED FOODS
CORPORATION, et al.,
Defendants.

No. 83 C 1424.

United States District Court,
N.D. Illinois, E.D.

Dec. 18, 1984.

Judson H. Miner, Davis, Miner, Barnhill & Galland, Chicago, Ill., for plaintiffs.

Michael A. Warner, James A. Burns, Jr., Seyfarth, Shaw, Fairweather & Geraldson, Floyd G. Hoffman, Ronald L. Scherubel, Consol. Foods Corp., Chicago, Ill., of counsel, for defendant.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

Dayton Bernstein ("Bernstein") and Harry Nissenson ("Nissenson") (collectively "Plaintiffs") brought this action under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, et seq. ("ADEA") against Consolidated Foods Corporation ("Consolidated Foods"), Douwe Egberts Company ("Douwe Egberts"), Douwe Egberts Superior Company ("DESC"), and Superior Coffee Company ("Superior") (collectively "Defendants"), seeking various forms of relief for Defendants' alleged age discrimination against Plaintiffs. Subject matter jurisdiction is based on 28 U.S.C. §§ 1331, 1343, and is not contested.

Presently before the court is Defendants' motion, pursuant to Fed.R.Civ.P. Rule 56, for summary judgment on all claims raised in Plaintiffs' Complaint ("Complaint") or, in

the alternative, for partial summary judgment with respect to Consolidated, Douwe Egberts and DESC. For the reasons set forth below, Defendants' motion is denied except as to DESC.

### Factual Background

For purposes of a motion for summary judgment, this Court must, of course, view all pleadings and supporting papers in the light most favorable to the non-moving party. *Trulson v. Trane Co.*, 738 F.2d 770 (7th Cir.1984). Thus, the facts are stated below in the light most favorable to Plaintiffs. See *Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d 407 (7th Cir.1984); *Trulson*, 738 F.2d at 771.

Plaintiff Bernstein, born on December 8, 1927, began working for Superior Tea and Coffee Company ("Superior Tea") in 1953. Plaintiff Nissenson, born on November 11, 1919, started working for Superior Tea in 1958. Both men advanced themselves in the company: Bernstein became Vice President of Operations in 1968, then Senior Vice President of Operations in 1972; Nissenson became Vice President of Finance in the early 1970's.

In January, 1979, Douwe Egberts, a Dutch corporation, purchased Superior Tea, renamed it Douwe Egberts Superior Company ("DESC"), and began to operate it as a wholly-owned subsidiary. Before the purchase, 95% of Superior Tea had been owned by two brothers, Earl and Sanford Cohn, who were Chairman and President, respectively. Shortly after the acquisition, Bernstein and Nissenson signed three year employment contracts with Douwe Egberts' American identity, Moccomat Beverage Systems. Under these contracts, DESC's Board of Directors and Chief Executive Officer retained the right to change their titles or duties. In all other respects, the management structure remained 'unchanged.

In May, 1979, Douwe Egberts initiated a series of changes. Antoine Beumer was installed as Vice Chairman of DESC; upon Sanford Cohn's retirement in January, 1980, Beumer was appointed President. Also in mid-1979, Hans Van der Linden came from Douwe Egberts for the purpose of conforming DESC's accounting report to the requirements of its new Dutch parent company. He was appointed Director of Financial Control, reporting to Nissenson. At the same time, Nat Zivin was transferred to DESC from Consolidated, Douwe Egbert's parent company, as a consultant. In October, 1980, upon the retirement of Earl Cohn, Zivin became Chairman of the Board and Chief Executive Officer of DESC. Soon after, the new leadership of DESC substantially changed the responsibilities of both Mr. Bernstein and Mr. Nissenson.

### 1. Mr. Bernstein's Claims

In October, 1980, Zivin told Bernstein that he would no longer be Senior Vice President of Operations but instead would assume a new position, Vice President of Corporate Planning and Development. Zivin contends that he made the change because of Bernstein's allegedly autocratic management style and a perceived need for long-range planning. When informed of the change by Zivin, Bernstein expressed concern that he would not be able to operate in that position effectively because he would have no access to inside information concerning the corporation. In response, Zivin told Bernstein that he had no choice but to give the new position a try.

Several weeks later, Bernstein met with Zivin again and complained that his new position was a sham: there was nothing to do, and no one would provide him with any information. Bernstein asked Zivin "where [he] stood in the organization" and Zivin told him to "take time over the weekend to determine how [he] would fit into the company." Based on a rumor that Beumer was returning to Holland, Bernstein prepared a memorandum proposing that he be considered for President or Executive Vice President. In response, Zivin and Beumer told Bernstein that they would not consider him for either position. According to Bernstein, Zivin and Beumer would not disclose the reason for their refusal. They merely told him that no other place existed for him in the company, and they suggested that he

"find employment elsewhere." In addition, they told Bernstein that he could use their telephone to make calls, that he could take time off for interviews, and that it would be in his best interest to start searching. At the same time, according to Bernstein, they said that there was nothing wrong with his abilities or job performance.

Shortly thereafter, Bernstein's secretary was transferred to someone else, and he spent the next five months working only approximately one hour per day. In March, 1981, Bernstein decided to resign from the company because of stress-related health reasons. At a meeting that included Beumer, Zivin and Bernstein negotiated a resignation agreement. By the resignation agreement, the company gave Bernstein approximately $50,000, in return for his agreement not to seek "any other remuneration, compensation or payments from [DESC] or Douwe Egberts relating to [his] employment...." No discussion occurred regarding any potential age discrimination claim or any other legal claims Bernstein might have against the company. The resignation was effective March 6, 1981.

### 2. Mr. Nissenson's Claims

In early 1980, Nissenson found that he was sharing responsibilities for the accounting function with Hans Van der Linden, the Douwe Egberts accountant. Later that year, Dan Kulik was brought in from Consolidated Foods as a consultant. Kulik worked directly with Van der Linden, rather than with Nissenson. In October, 1980, Zivin informed Mr. Nissenson that he would be relieved of all current major responsibilities except over the credit department, and that instead he would be responsible for the equipment service department and a new cost-cutting program. Zivin contends he made the change for two reasons: Kulik had advised Zivin that a restructuring of the financial reports was necessary to improve the company's position, and Zivin believed that Nissenson's experience was well-suited to the important job of reviewing and cutting costs. In his place, Dan Kulik assumed responsibility over the Financial Control and Management Information Services departments. In January, 1981, 39-year-old Kulik was appointed to the new position of Executive Vice President of Administration, responsible for coordinating all financial and administrative functions of the company.

Mr. Nissenson began working on his new duties, spending a great deal of time reviewing expenses, preparing memoranda, and making recommendations. He was frustrated in performing his job, however, by a total lack of information and authority to make changes. Moreover, he could not work directly with those whose work he was supposed to analyze.

Nissenson began to complain to Zivin that he had no real responsibility. Nissenson recalled one such meeting where Zivin said to him, "Why don't you and I retire and go fishing." In early May, 1981, Nissenson met with Zivin and told him: "You've made a nothing out of me.... You've taken the job away and on that basis I feel I'm forced to retire." According to Nissenson, Zivin replied, "Harry, I'm sorry you feel that way, but maybe it would be for the best." Nissenson and Zivin discussed the terms of a resignation agreement. Again, no discussion occurred regarding Nissenson's waiver of any potential claims he might have against the company. Nissenson's resignation became effective May 8, 1981.

### Discussion

Under Section 623(a) of the ADEA, it is unlawful for an employer '... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.' 29 U.S.C. § 623(a). In cases brought under the ADEA, the courts have applied uniformly the test for causation established in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Parker v. FNMA*, 741 F.2d 975 (7th Cir.1984) (and cases cited therein). Using this method:

> [The] plaintiff [first] has the burden of proving by the preponderance of the evi-

dence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted).

■ To establish a prima facie case of age discrimination, a plaintiff must show: (1) that he was a member of the protected age group at the time of his discharge; (2) that he was qualified for his job in that he was meeting all of his employer's legitimate expectations; (3) that he nevertheless was discharged; and (4) that his employer then sought someone younger to perform the same work or otherwise acted in a manner suggesting that the plaintiff was discharged because of his age.[1] *Huhn v. Koehring Co.,* 718 F.2d 239, 243 (7th Cir.1983), citing *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979); *Stanojev v.*

*Ebasco Services, Inc.,* 643 F.2d 914, 919–21 (2d Cir.1981).

Defendants move for summary judgment on four separate and distinct grounds. First, Defendants contend that Plaintiffs voluntarily resigned from their positions at DESC. Defendants argue that because Plaintiffs were not discharged, Plaintiffs fail to meet their burden of establishing a prima facie case for an ADEA violation. Second, Defendants assert that even if Plaintiffs were found to satisfy the elements of the prima facie case, they are unable to show that the articulated reasons for changing the duties of Bernstein and Nissenson were merely pretexts for age discrimination. Third, Defendants claim that even assuming, arguendo, that Plaintiffs can prove all of the elements of an ADEA case, Bernstein and Nissenson waived all rights and claims against Defendants, including any ADEA rights, by the terms of their resignation agreements. Finally, in the alternative, Defendants assert that summary judgment should be granted to Consolidated, Douwe Egberts and DESC, because none of them is a proper party to this suit. This Opinion will examine each of Defendants' contentions in turn, in light of summary judgment principles.[2]

---

**1.** The fourth requirement of the "pure" McDonnell-Douglas paradigm, often cited in discrimination cases, is that plaintiff be replaced by someone outside the protected age group. The First Circuit extensively analyzed the application of the McDonnell-Douglas standard to the age discrimination-discharge context in *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir.1979). The court reasoned that the purpose of the replacement requirement is to show a continued need for the same services and skills and thus to eliminate one possible, lawful reason for discharge. Thus, a "replacement need not be sought from outside the company nor need he be designated formally as such." Id. at 1013 n. 11. Further, since the purpose of the requirement is to make it more likely that the reason for discharge was discriminatory, the court found that other evidence that would also create an inference of discrimination would fulfill the requirement. Id. at 1018. The court pointed at a company organization chart listing ages as one example of such evidence. Id.

Defendants here do not contest that the fourth element of the McDonnell-Douglas test has been satisfied.

**2.** In order to prevail on a motion for summary judgment, a defendant has the burden of establishing that there is no genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222 (7th Cir.1984). Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Hermes v. Hein,* 742 F.2d 350 (7th Cir.1984). The existence of a factual dispute, however, only precludes summary judgment if the disputed fact is outcome-determinative. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *Korf,* 726 F.2d at 1226, quoting *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1306 (9th Cir.1982). Thus, with respect to each ground for summary judgment that Defendants

## I. Constructive Discharge

■ Defendants contend that Plaintiffs do not carry their initial burden of establishing a prima facie case of discrimination because neither can show that he was in fact discharged. Although Defendants do not contest that a resignation can sometimes operate as a legal or constructive discharge, Defendants argue that the resignations of both Bernstein and Nissenson were wholly voluntary. It is well-established that to find a discharge in an employment discrimination case, the trier of fact must be satisfied that the plaintiff's working conditions were "so difficult and unpleasant that a reasonable person in [his] position would have felt compelled to resign." See, e.g., *Scott v. Oce Industries,* 536 F.Supp. 141, 148 (N.D.Ill.1982); *Nolan v. Cleland,* 686 F.2d 806, 812–14 (9th Cir. 1982); *Downey v. Southern National Gas Co.,* 649 F.2d 302, 305 (5th Cir.), reh'g denied, 656 F.2d 704 (1981).

■ Defendants argue that this Court should adopt the minority position of the Eighth and Tenth Circuits, which have added a second requirement to the test: Plaintiff must also prove the employer's actual intent to force the employee to resign.[3] Because the Seventh Circuit has yet to address constructive discharge in the employment discrimination context, this Court chooses to adhere to the objective standard followed by the Fifth, Sixth, Ninth, Eleventh, and District of Columbia Circuits, as well as by districts courts in the Second and Third Circuits and in our own Northern District of Illinois.[4]

Application of this "reasonable person" test involves complex questions of fact, including, inter alia, the nature of the working conditions, their difficulty or unpleasantness, and what a reasonable person would or would not do under such conditions. Thus, the issue of whether there has been a constructive discharge normally should be left to the trier of fact. *Bailey v. Binyon,* 583 F.Supp. 923, 929 (N.D.Ill.1984). See, e.g., *Nolan,* 686 F.2d at 812–14 (holding that summary judgment was improper on the issue of constructive discharge). Situations may exist, however, where an employee's actions are unreasonable as a matter of law and summary judgment is appropriate on the issue of constructive discharge. See, e.g., *Schaulis v. CTB/McGraw Hill, Inc.,* 496 F.Supp. 666, 676 (N.D.Cal.1980) (employer's motion for summary judgment on the issue of constructive discharge granted because plaintiff was unable to show that employer policies and inadequate working conditions for lower-level editors were particular to her. Id. at 673–74).

■ Each case must be decided on the facts, but courts have found that a reasonable person may be "constructively discharged" by a dramatic decrease in responsibility; by a demotion; or by being in-

---

argue, this Court must first establish which facts are material, and then analyze the record to determine whether any such facts are validly disputed.

**3.** See *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981); *Muller v. United States Steel Corp.,* 509 F.2d 923 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). Defendants attempt to show that the United States Supreme Court in *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) has resolved this question in favor of the two-prong, subjective intent approach. This attempt is misleading. *Sure-Tan* mentions in passing, the "anti-union animus element" of the test for a Section 8(a)(3) of the National Labor Relations Act violation. Section 8(a)(3) makes it an unfair labor practice for "an employer to discriminate against an employee in order to encourage or discourage membership in any labor organization." (Emphasis added.) Clearly, subjective intent on the part of the employer is a necessary element for finding an unfair labor practice under Section 8(a)(3). There is nothing in this case to suggest adopting an equivalent requirement for constructive discharge in Title VII or ADEA employment discrimination cases. Accord *Bailey v. Binyon,* 583 F.Supp. 923, 929 (N.D.Ill.1984) (discussing a similar Section 8(a)(3) case from the Seventh Circuit).

**4.** See *Bailey v. Binyon,* 583 F.Supp. 923, 928–29 (N.D.Ill.1984) (and cases cited therein) for an extended discussion of the development of the constructive discharge standard in the employment discrimination context. See also *Scott v. Oce Industries,* 536 F.Supp. 141, 148 (N.D.Ill. 1982).

formed by a superior that one has reached a "permanent plateau" in one's career.[5] For example, in *Scott v. Oce Industries*, 536 F.Supp. at 145, after plaintiff complained about salary disparities between the sexes, her supervisor avoided speaking to her and instead communicated various changes in her duties by written memoranda. She was also stripped of several previously-held responsibilities. Id. Under these circumstances, the court found a constructive discharge. Similarly, in one ADEA case, *Downey v. Southern National Gas Co.*, 649 F.2d 302, 305 (5th Cir.1981), plaintiff told the personnel director of his disappointment over denial of a transfer request which he made following a demotion at the age of 58. According to plaintiff's testimony, the director informed him that the company did not have anything else for him to do and that he was in danger of discharge and subsequent loss of retirement benefits. Under those facts, the court reversed summary judgment because there was a contested issue as to constructive discharge.

■ This Court finds that Defendants have failed to show that there is no genuine issue of material fact on the question of whether Plaintiffs here were constructively discharged. Because the cases focus heavily on the specific facts of each case in analyzing what a 'reasonable person' would do in certain circumstances, Defendants' arguments that unless an employer utters certain specific words or creates a particular combination of working conditions, the employee cannot as a matter of law prove constructive discharge, are unconvincing.[6] Viewing the facts in the light most favorable to Plaintiffs, it is entirely possible that a reasonable person in such circumstances might have felt compelled to resign.

■ According to Bernstein, after he complained that his new job was a 'sham,' he was told that there was no other place for him in the company and that he might want to look elsewhere. His secretary was transferred elsewhere, and he was left with a telephone, a desk, and a job that required only approximately an hour per day to perform. In addition, Beumer and Zivin checked with him periodically to see how his job search was progressing. Of course, Defendants have a different version of the facts.[7]

Nissenson also states facts in his deposition upon which a trier of fact could base a finding of constructive discharge. According to Nissenson, once Kulik and Van der Linden were transferred to DESC, Nissenson found himself removed from the process of financial reporting. He expended a great deal of effort on his new cost-cutting assignment, reviewing every expenditure, but was frustrated by a lack of information. He repeatedly complained to Zivin about his lack of responsibilities, but received no response. When he told Zivin that his job had been taken away and that he felt he had no choice but to retire, Zivin responded that retirement would be for the

---

5. See, e.g., *Reussou v. Eddington*, 483 F.Supp. 739 (D.Colo.1980) (where a policeman's supervisor told him that he would no longer be eligible for scheduled pay raises or further training and that his career had reached a "permanent plateau," the court found a constructive discharge).

6. Defendants argue that the fact that Zivin merely told Bernstein that he might wish to look elsewhere distinguishes his case from *Downey v. Southern National Gas Co.*, 649 F.2d 302, 305 (5th Cir.1981), where summary judgment for the employer was reversed because plaintiff was told that he would be fired unless he chose early retirement. First, Defendants simply misconstrue Downey; plaintiff there actually testified that the personnel director told him he was in danger of being discharged and he would lose retirement benefits if the company decided to discharge him. Second, the language used is not conclusive: at issue is the reaction of a reasonable person upon being informed by his Chief Executive Officer that there was no place for him in the company and that finding another job was advisable.

7. According to Zivin, Bernstein was charged with a task critical to the long range success of the company; Bernstein was assured of a continued flow of important projects; and Zivin merely suggested to Bernstein that if he was unhappy in that role, he should think about another company. This conflicting version of the facts simply confirms that this is not a question to be decided on summary judgment.

best.[8]  Because the evidence in the record reveals a clear and material factual conflict regarding whether Bernstein and Nissenson were constructively discharged, this Court cannot find that Plaintiffs' resignations were unreasonable as a matter of law.  Accordingly, Defendants' motion for summary judgment on the issue of constructive discharge is denied.

## II.  Discrimination Based on Age

Defendants next contend that even assuming, arguendo, that Plaintiffs can establish a prima facie case of age discrimination, they have proferred legitimate reasons for placing Plaintiffs in the positions from which they were allegedly forced to resign.  Defendants argue that Plaintiffs have failed to present evidence from which it can be reasonably inferred that those reasons were a pretext for discrimination, thereby entitling Defendants to summary judgment.

Plaintiffs offer the following facts, in addition to those leading up to their resignations, to show that Defendants' reasons were a mere pretext, and that their responsibilities were actually taken away because of their age:

(1) A 1979 Douwe Egberts report on its corporate plan for DESC for fiscal years 1980–83, prepared after Beumer was brought in as Vice-Chairman of DESC, which includes:

(i) an organization chart of DESC's top management listing, among other things, their ages;  and

(ii) a statement, under the heading "Management Weaknesses," "Age above Average."

(2) A 1980 DESC Pension Trust study conducted by the Human Resources Department which includes calculations of the annual base pay earnings of ten employees selected by the Director of Human Resources, all over 50, all but one of whom Bernstein and Nissenson assert were subsequently terminated or forced to resign.

(3) Nissenson's responsibilities over the Accounting and Management Information Services departments were transferred to Dan Kulik.  Three months later, at Zivin's direction, Kulik was made Executive Vice President of Administration.  A Human Resource announcement noted Kulik's age: 39 years old.

(4) Beumer told Bernstein to reduce his staff of three regional distribution analysts to one, and specified that the oldest one of the three, Victor Knox, should be dropped.

■  Defendants basically argue that the above facts are irrelevant because Plaintiffs must prove unlawful motivation on the part of the specific individual whose decisions resulted in the alleged discrimination.  According to Defendants, it was Zivin's decisions alone that created the conditions which Plaintiffs' claim forced them to resign;  thus, evidence of discriminatory motives of some other company officials is irrelevant.

Defendants' claim, however, conflicts with the holdings of several cases.[9]  For

---

8. Defendants, on the other hand, argue that Nissenson had been given an important role in the company.  His new duties kept him busy, as is evidenced by his regular reports to Zivin and his recommendations for improving DESC's performance.

9. Defendants rely on three cases to prove that only the actions of the specific individual who made the allegedly discriminatory decisions are relevant.  *Ortiz v. Ciba-Geigy Corp.*, 87 F.R.D. 723 (N.D.Ill.1980), is inapposite.  There, defendant was granted summary judgment where plaintiff's only evidence of race discrimination was a single comment by a fellow low-level employee that plaintiff was a "dirty Mexican."  Id. at 725.  More pertinent is *Stenebach v. CPC*

*International, Inc.*, 691 F.2d 735 (5th Cir.1982), cert. denied, 461 U.S. 944, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983), where plaintiff relied on a list containing company employees' ages and a statement by someone at corporate headquarters that age might be a relevant factor in the reorganization effort.  The Fifth Circuit granted summary judgment to the defendant employer, but the case is distinguishable because the actual reduction-in-force decisions at issue were based exclusively on scores received on an exhaustive objective test devoid of any reference to age, and the overall effect of the reduction was to increase the average age of employees.  Id. at 738.  A case decided in the Northern District of Illinois, *Roane v. GTE Automatic Electric, Inc.*, No. 80 C 3551, slip op., (N.D.Ill.1982), provides the

example, in *Meschino v. ITT Corp.*, 563 F.Supp. 1066 (S.D.N.Y.1983), the court stated that one way to forestall summary judgment is the production of "any evidence that any responsible company official stated a preference to retain younger employees in effecting eliminations that were required under a reorganization." Id. at 1072, quoting *Nash v. Jacqueline Cochran, Inc.*, 548 F.Supp. 676 (S.D.N.Y.1982) (emphasis added). Moreover, the Seventh Circuit has recently held that "past discriminatory acts of an employer are evidence of a 'custom' or 'policy' of discrimination" and thus relevant to a summary judgment motion. *Herman v. National Broadcasting Co.*, 744 F.2d 604, 609–10 (7th Cir.1984).

The facts of *Herman* clearly disprove Defendants' claim that actions by company officials prior to Zivin's becoming Chief Executive Officer of DESC are irrelevant. In *Herman*, defendant's news station had gradually phased out film editor positions, replacing them with video tape editor openings. Plaintiffs were two experienced film editors who had applied and been rejected for the new positions in 1976, 1977, and 1978. They were terminated in 1979, and later brought an ADEA suit. Plaintiffs submitted an affidavit which stated that in 1974 the station's past General Manager had made a statement to the effect that being fifty years old was a bar to being hired for the staff. The offending individual left the station in 1976, and was in no way a part of the 1977 and 1978 rejections or the eventual terminations, and yet the Seventh Circuit concluded that the statement was valuable as evidence of possible age discrimination. Id. Other Circuits have also found evidence of general company policy relevant, refuting the proposition that courts are restricted to facts indicating the motivations of the specific individual responsible for the allegedly discriminatory decisions.[10]

Plaintiffs assert that the facts give rise to a reasonable inference that the company was concerned with the age of its employees and that they were given different duties because of their ages. According to Plaintiffs, they stood by while a number of other older employees were terminated or forced to resign. Bernstein was expressly told by the President of DESC to fire one employee over another because that employee was the older one. Company reports—the organization chart, and the announcement of Kulik's promotion—contained references to age for the first time in Plaintiffs' long experience at the company. One such report even listed "Age above average" as a management weakness.

Defendants dismiss all these occurrences as innocent or irrelevant. First, they assert that it was Zivin alone who was responsible for the changes which allegedly led to Plaintiffs' resignations and that there is no evidence that Zivin was even

best authority for Defendants' argument. There, the Court found a "Staff Reduction List" containing plaintiff's age to be irrelevant because the individuals who fired plaintiff had no knowledge of the list's existence or its authors. *Roane* involved a staff reduction choice between two employees, where one had clearly superior experience and skills. The distinguishable context of Roane, and the more recent Seventh Circuit decision where similar evidence was considered relevant, *Herman v. National Broadcasting Co.*, 35 FEP Cases 1653, 1657 (7th Cir. 1984), see discussion supra, dilute the effect of even *Roane v. GTE Automatic Electric, Inc.* Thus, Defendants' case law fails to show that circumstantial evidence of discriminatory tendencies on the part of company employees other than the individual who discharged Plaintiffs is automatically irrelevant.

10. See, e.g., *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1018 (1st Cir.1979), where the First Circuit noted that plaintiffs can use various types of circumstantial evidence to raise the necessary inference of age discrimination. As an example, the court held that company documents, including a company organization chart stating ages, might be interpreted as indicating a preference for younger employees, although there was no direct evidence that the plaintiff in particular was fired because of his age. Id. Similarly, where shortly before its reorganization, the defendant company had conducted a survey which revealed that, in comparison with other similar companies, it had the highest average employee age, the Fifth Circuit considered such evidence relevant to whether plaintiff had presented a jury question. *Hedrick v. Hercules, Inc.*, 658 F.2d 1088 (5th Cir.1981).

aware of the 1979 report, the pension study, or the terminations of older employees. Further, even if Zivin was so aware, Defendants contend that Plaintiffs have not proved any causal connection between these incidents and actions taken concerning Bernstein and Nissenson.

As one court said when faced with circumstantial evidence in an age discrimination case: "Whether the statements in question comprise a 'smoking gun' evidencing a policy of age discrimination or are wholly innocuous is largely a question of credibility, an issue properly left for trial." *Meschino*, 563 F.Supp. at 1072. Reversing a judgment for defendants in an age discrimination case, the District of Columbia Circuit wrote:

> In any event, when weighing the evidence the ... Court must keep in mind the difficulties plaintiffs face in proving ADEA violations. Employees ... have great informational disadvantages: they cannot search into the minds of decisionmakers, and therefore they usually can gather only circumstantial evidence of discriminatory motives. Hence, the trier of fact should take special care to require of plaintiff only that he present sufficient evidence to allow a reasonable person to draw from it the inference of the fact to be proved.
>
> *Cuddy v. Carmen*, 694 F.2d 853, 859 (D.C.Cir.1982).

■ This Court holds that a reasonable person could infer from the stated events that Plaintiffs' ages played a role in Zivin's decisions. A reasonable person could find that there was age-conscious planning by the corporate hierarchy in general and by Beumer in particular. It is not unreasonable to infer that Zivin, as Chief Executive Officer of DESC, worked together with or influenced Beumer and the Human Resource Department in their actions, or that Zivin's plans for company management conformed with the policies implied in the Douwe Egberts corporate plan for DESC for fiscal years 1980–83. Although Zivin states in his affidavit that age had nothing to do with his decisions regarding Plain-

tiffs' roles in the company, this question of motivation should be resolved at trial. Viewing all inferences from the underlying facts in the light most favorable to Plaintiffs, as this Court is bound to do in deciding this motion, Plaintiffs have succeeded in demonstrating a material factual dispute as to whether age discrimination played a role in the decisions causing their allegedly forced discharges. Accordingly, Defendants' motion for summary judgment on this ground is denied.

## III. Waiver in Resignation Agreements

Defendants argue next that even if Plaintiffs could raise a material factual dispute as to constructive discharge and as to whether the discharge was caused by their ages, Defendants are still entitled to summary judgment because this suit is barred by the terms of their resignation agreements. They assert that Plaintiffs were both experienced, sophisticated businessmen who necessarily must have felt discriminated against on the basis of age when they signed the resignation agreements. Those agreements gave each of them approximately $50,000 and ended their right to 'any other remuneration, compensation or payments ... relating to their employment.' Defendants contend Plaintiffs implicitly waived all future claims against DESC, including ADEA rights. Plaintiffs, on the other hand, point out that there was no mention of ADEA rights in the negotiations or the agreements, there was not even a general release from all claims against the company in the agreements, and the structure of the agreements arguably suggests that their only purpose was to cancel benefits owed under Plaintiffs' employment contracts. According to Plaintiffs, the negotiations covered only settlement for the $70,000 per year of salary and benefits that they were owed under their employment contracts.

The United States Supreme Court has clearly stated that to determine the effectiveness of a waiver of a Title VII employment discrimination claim as part of a voluntary settlement, "a court would have to

determine at the outset that the employee's consent to the settlement was voluntary and knowing." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974). See also *Cox v. Allied Chemical Corp.*, 538 F.2d 1094, 1087 (5th Cir.1976), cert. denied, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978); *Odomes v. Nucare, Inc.*, 653 F.2d 246, 253 (6th Cir.1981).

Despite the Supreme Court's unequivocal directive, Defendants rely on *Runyan v. NCR Corp.*, 573 F.Supp. 1454, 1462–63 (S.D.Ohio 1983), for the proposition that when a person is aware that he may have a claim against his employer under Title VII or the ADEA, but nevertheless signs a broadly worded agreement in which he waives all future claims against the employer, the fact that specific legal claims were not mentioned in the waiver section of the agreement does not destroy the waiver's effectiveness. In *Runyan,* however, the plaintiff was an experienced labor lawyer who had informed his employer that he thought his termination as general counsel was motivated by age discrimination. Mr. Runyan signed an "Accord and Satisfaction, Release, and Discharge" which provided that he "hereby release[d] and forever discharge[d] [his employer] … from all manner of actions and actions, cause and causes of action, suits…." Id. at 1457. *Runyan* is thus clearly distinguishable from this case. Id. at 1457, 1464.[11]

■■■■ This Court finds that Plaintiffs have raised genuine issues of material fact as to whether the resignation agreements contain a knowing and voluntary release of ADEA claims against DESC. The absence of any mention of possible age discrimination claims either before or during negotiations of the agreements, the fact that the agreements refer to Plaintiffs' right to "remuneration" and "compensation" rather than their "causes of actions" or "suits," and Bernstein's and Nissenson's descrip-

tions of the purpose and content of the negotiations are among the numerous factual conflicts which indicate that Defendants are not entitled to judgment as a matter of law on this ground.

## IV. The Proper Parties to this Suit

■■■■ In the alternative, Defendants contend that summary judgment should be granted to Consolidated, Douwe Egberts, and DESC because none of them is a proper party to this suit. They argue first that Plaintiffs are prohibited from suing Consolidated and Douwe Egberts because they neglected to list those companies as respondents in their EEOC charges. Second, they argue that the Court lacks jurisdiction over DESC because that company has ceased to exist as an "employer" under the ADEA. Plaintiffs respond that Consolidated and Douwe Egberts come within the exceptions to the general rule that naming a defendant in the EEOC charge is a prerequisite to later suit. They also argue that even if Consolidated does not qualify under an exception, Consolidated is nonetheless liable as a "successor" of DESC.

The relationship between the four Defendants in this suit is as follows. In January, 1979, Douwe Egberts, a subsidiary owned 65% by Consolidated, purchased Superior Tea and Coffee Company, renamed it Douwe Egberts Superior Company ("DESC"), and began to operate DESC as a wholly-owned subsidiary. The facts which form the basis of Bernstein's and Nissenson's age discrimination claims occurred during the period from the time of that change of control to their resignations in March and May of 1981, respectively. DESC received a copy of the charges of age discrimination filed with the EEOC by Nissenson in August, 1981 and a copy of Bernstein's charge in November, 1981. These charges named DESC as the sole respondent. In July, 1982, Consolidated bought DESC from Douwe Egberts, liqui-

---

11. See also *Pilon v. University of Minnesota,* 710 F.2d 466, 467 (8th Cir.1983) (summary judgment for defendant upheld where release contained language identical to that in the Runyan agree-

ment, which agreement had been negotiated by plaintiff's attorney as part of the settlement of a previous sex discrimination claim).

dated DESC into Consolidated, and began to operate the entity, now called Superior Coffee Company, as a division of Consolidated. Plaintiffs' Complaint, filed in March, 1981, named four defendants: Consolidated, Douwe Egberts, DESC and the new Superior Coffee Company.

It is well settled that ordinarily a party not named in an EEOC proceeding may not be sued subsequently for the same claim. *LeBeau v. Libbey-Owens-Ford Co.*, 484 F.2d 798, 799 (7th Cir.1973). The Seventh Circuit, in accord with the Supreme Court's opinion in *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), held, however, in *Liberles v. County of Cook*, 709 F.2d 1122, 1125 (7th Cir.1983), that an exception may exist to the general rule: naming a defendant in an EEOC suit is not a jurisdictional prerequisite to a later employment discrimination suit against that defendant.

Those exceptions were carefully analyzed by the Seventh Circuit in *Eggleston v. Chicago Journeymen Plumber Local Union No. 1*, 657 F.2d 890 (7th Cir.1981), cert. denied, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). Where, for example, an unnamed party has been provided with adequate notice of the charge and has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance, the charge is sufficient to confer jurisdiction over that party. Id. at 905 (and cases cited therein). Actual participation in conciliation is not an inalienable right of a defendant: if the unnamed party has a close relationship with the named party, and it is likely that the unnamed party had actual notice of the EEOC charge, that party had a sufficient opportunity to conciliate. Id. at 907. The court in *Eggleston* also adopted the four-prong test used by the Third Circuit in *Glus v. C.G. Murphy Co.*, 629 F.2d 248, 251 (3d Cir. 1980), vacated on other grounds, 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981).

That test examines: 1) the plaintiff's ability to ascertain the role of the unnamed party at the time of the EEOC charge; 2) the similarity of interests of the named and unnamed parties; 3) any actual prejudice to the unnamed party resulting from omission from the charge; 4) and whether the unnamed party has in any way represented to plaintiff that the relationship between the plaintiff and the unnamed party is through the named party. This test is not mechanical; no single prong is decisive. Id. at 908.

Plaintiffs have cited no evidence in the record to support a finding that Consolidated, at the time of the EEOC charge, either knew, or was so closely related to DESC that it should have known of the proceedings.[12] There is, however, some record evidence showing a close relationship between Douwe Egberts and DESC at that time. DESC was the wholly-owned subsidiary of Douwe Egberts. Antoine Beumer, the allegedly age-conscious President of DESC, had been installed as President by Douwe Egberts. In addition, it was a Douwe Egberts report, its corporate plan for DESC, that contained allegedly discriminatory material concerning management age.

Whether the relationship between a parent corporation and its wholly-owned subsidiary is close enough to satisfy the Eggleston exceptions is a disputed question of law. In one case also involving *Consolidated, Watson v. Fuller Brush Co.*, 570 F.Supp. 1299 (W.D.Mich.1983), the court found that the parent-wholly-owned subsidiary relationship itself satisfies the four-prong Eggleston test. The court first found that the second and third prong outweigh the first and fourth, then applied the test to find that as "a wholly-owned subsidiary of Consolidated, Fuller, it would appear, had interests substantially similar to those of Consolidated. In addition, it does not appear that Consolidated would have been prejudiced by not having been named

---

**12.** Plaintiffs assert in their brief, without any citation to the record, that representatives of Consolidated actually came to the EEOC conciliation meetings on Plaintiffs' charges and represented Defendants with respect to those charges.

Defendants contend that no evidence in fact exists in the record to support this claim. Thus, this Court cannot properly consider Plaintiffs' allegation in deciding Defendants' motion for summary judgment.

before the EEOC—particularly since its interests undoubtedly would or could have been protected by Fuller." Id. at 1301–02.

Other courts, however, have held that the mere existence of a parent-subsidiary relationship does not satisfy the Eggleston test. Those courts have held that plaintiffs must also show "substantial identity" or a degree of control by the parent such that the subsidiary is its "agent." *Heid v. Ertl Co.*, 21 FEP cases 263 (N.D.Iowa 1979), *Hill v. Singing Hills Funeral Home, Inc.*, 77 F.R.D. 746 (N.D.Tex.1978). Those standards were satisfied where the parent company exercised any control over the employment policies or the personnel management of the subsidiary, *Owen v. Western Electric Co.*, 21 FEP Cases 797 (M.D.N.C. 1979), and where the two companies shared key personnel or both participated in the conciliation process, *Hill*, 77 F.R.D. at 748–49.

There are sufficient facts in the record to create a material issue as to the extent that Douwe Egberts influenced or controlled the employment policies of DESC during the relevant periods, through its corporate planning or selection of key personnel. For this reason, and also in light of the decision in Watson, this Court cannot hold as a matter of law that Douwe Egberts is not a proper party to this suit. Summary judgment as to Douwe Egberts is therefore denied.

Plaintiffs next argue that Consolidated is a proper party, regardless of the EEOC charge question, because it is the successor to their former employer, DESC. Successor corporations of original defendants have been held proper parties in suits based on their predecessor's employment discrimination, even though they were not included in the EEOC charge. *EEOC v. Sage Realty Corp.*, 87 F.R.D. 365 (S.D.N.

Y.1980); *Escamilla v. Mosher Steel Co.*, 386 F.Supp. 101 (S.D.Tex.1975). Courts have held that when a successor corporation has not been named in antecedent charges filed with the EEOC, its liability to suit depends on whether the successor company had notice, whether the predecessor is capable of providing relief, whether there has been a substantial continuity of business operations, and whether the new employer uses the same facilities, employees, and management and produces the same product or service. *Slack v. Havens*, 522 F.2d 1091, 1094 (9th Cir.1975), citing *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir.1974). *MacMillan* also specified, however, that the "nature and extent of liability is subject to no formula, but must be determined upon the facts and circumstances of each case. The primary concern . . . is to provide the discriminatee with full relief . . . . [T]he amenability of the predecessor to suit and its ability to provide relief will be a necessary inquiry." 503 F.2d at 1092. The Court's primary concern with providing a complete remedy and its desire to avoid 'evasion in the guise of corporate transfers of ownership' give primary significance to that element of the test concerning the predecessor's ability to provide relief. Id.

In this case, the predecessor, DESC, is unable to provide any relief because it has been liquidated. Consolidated is now operating that entity, Plaintiffs' former employer, as a division of Consolidated, under the name of Superior Coffee Company ("Superior").[13] In Watson, 33 FEP Cases at 587, Consolidated was included as a party despite omission in the EEOC charge solely because it was the parent of the defendant employer. Here, Consolidated was the actual owner of DESC at the time of the

---

13. Defendants do not assert that the court lacks jurisdiction over Superior. However, where a plaintiff named only her employer, a division of Victor United Inc., in an EEOC charge, the court found that a division of a corporation is not an 'employer' under the ADEA, and granted her leave to amend the complaint to allege facts sufficient to include the corporation as a defendant, noting that otherwise the plaintiff

would be without remedy. *Heid v. Ertl*, 21 FEP Cases at 263, 265 (N.D.Iowa 1979). See also *Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 911 n. 1 (7th Cir.1981), vacated on other grounds, 456 U.S. 1002 (1982) (where plaintiff's employer was acquired by Consolidated and thereafter operated as a division of Consolidated, Consolidated, rather than plaintiff's employer, the division, was the proper party for suit).

alleged violation (as 65% owner of Douwe Egberts, DESC's parent) and is now operating the company as one of its divisions. It is true that the Plaintiffs have failed to provide evidence on the current operation of Superior and its similarity to DESC. The court which established the test for successor liability, however, itself emphasized the remedial nature of federal employment discrimination laws and the importance of considering the predecessor's ability to provide relief. The court in Mac-Millan, supra at 1092, further stated: "It is to be emphasized that the equities of the matter favor successor liability because it is the successor who has benefitted from the discriminatory employment practices of its predecessor." For these reasons, the Court finds that Consolidated is not entitled as a matter of law to be dismissed as a defendant, and summary judgment as to it is denied.

Defendants further argue that DESC is not a proper party to this suit because as of July, 1982, DESC ceased to exist as an "employer" under the ADEA. Plaintiffs have not offered any facts or law in contradiction. Accordingly, summary judgment in favor of the non-existent DESC is granted.