Robert **ANDERSON**, Ronald E. Aspgren, et al., Plaintiffs,

v.

**MONTGOMERY WARD & CO., INC.,** et al., Defendants.

No. 82 C 7277.

United States District Court, N.D. Illinois, E.D.

Jan. 7, 1987.

Charles Barnhill, Paul Strauss, Davis, Miner, Barnhill & Galland, P.C., Joel F. Handler, Chicago, Ill., for plaintiffs.

James W. Gladden, Jr., Susan S. Sher, Judith M. Janssen, Mayer, Brown & Platt, Chicago, Ill., Thompson Powers, Ronald S. Cooper, Edmund W. Burke, Steptoe & Johnson, Chtd., Washington, D.C., Lawrence M. Donoghue, Chicago, Ill., for defendants.

## MEMORANDUM OPINION
## AND ORDER

BRIAN BARNETT DUFF, District Judge.

Plaintiffs in this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34, are 39 former employees of defendant Montgomery Ward & Co. ("Ward"), who allege that they were terminated or forced into early retirement because of age discrimination.

Thirteen of the plaintiffs ended their careers at Ward by participating in a "Voluntary Separation Program" ("VSP"), which Ward offered to selected employees in the fall of 1981. These plaintiffs ("the VSP plaintiffs") accepted separation payments and signed forms declaring their departures from Ward "voluntary for all purposes under applicable federal and state law," and waiving "all provisions of any compensation practices, either express or implied, between me and Montgomery Ward."

The case comes before the court on Ward's motion for summary judgment against the VSP plaintiffs. Ward makes two arguments in support of its motion: first, that the VSP plaintiffs were not discharged and thus cannot make out prima facie cases of age discrimination; and second, that the forms signed by the VSP plaintiffs release Ward from any liability under the ADEA.

### FACTS [1]

Ward was a troubled company in 1980 and 1981. It lost a total of $261 million

---

**1.** For the purposes of this summary judgment motion, the court accepts plaintiffs' evidence as true and draws all reasonable inferences in their favor. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

during those years, and was deeply in debt to its parent company, defendant Mobil Oil Corp. ("Mobil"). Early in 1981, Mobil installed a new president and chief executive officer at Ward, and charged him with turning the company around.

Among the concerns of Ward executives at the time was the age distribution of management personnel. *See, e.g.,* Plaintiffs' Exhibit ("PX") 1 at 118 *et seq.* Older, nonpromotable employees blocked many career paths at Ward, PX 7 at 2; PX 2 at 314–16, 322–23, making it likely that key employees and their designated replacements would retire almost simultaneously, and also preventing the promotion of talented younger employees, particularly women and minorities, on whom Ward executives felt the company's future depended. PX 2 at 314–16, 322–32; PX 14 at 80–81.

Members of Ward's new executive team made numerous derogatory comments about Ward's older, long-time employees, whom they blamed at least in part for the company's crisis. For example, Ward's new president, Stephen Pistner, referred to the employees who had been running the company prior to his arrival as "old asshole farts," PX 10 at 20, "gray-haired executives," *id.* at 26, and "good old boys," PX 12 at 241. When one of Ward's national merchandising managers rose to ask a question during a company meeting, Pistner asked, "Oh, Methuselah, you have a question?" PX 40 at 288–89. Chuck Miller, Ward's new executive vice president, referred to long-time employees as "old dunderheads" and "old dumb asses," PX 11 at 171–72, and as the "over-the-hill gang," *id.* at 55. When an unfamiliar employee's name came up in conversation, Miller frequently would ask the employee's age, *id.* at 169–70, or make a remark such as "well,

is he another one of the old people that needs a wheelchair to make it in?" *id.* at 171.

Against this background, Pistner, Miller, and other Ward executives began planning major personnel changes with the object of getting "younger blood in the company," PX 14 at 73–76. In the words of one of those who participated in the meetings leading to development of the VSP, Ward hoped to promote "high potential people, and most high potential people were younger people." *Id.* at 80–81; *see also* PX 17 at 514–515.

Ward intended the VSP as a restaffing program; "[i]t was not a program to reduce payroll through job elimination or reduction of pay of management," because the company planned to fill the jobs vacated by employees who accepted the VSP, and to pay replacements the same or slightly higher salaries.[2] PX 20 at 201, 322. Nor was the VSP a means of ridding the company of employees whose performance was unacceptable. According to one of the VSP's two coordinators, "there was no record of substandard performance" by the employees to whom Ward offered the VSP, and thus Ward could not have fired them. PX 20 at 56, 99–100.

Ward implemented the VSP in stages, beginning in August, 1981, when it notified the first employees that they were eligible to retire immediately with separation pay equal to five percent of their current annual base salary, times their years of service, up to a maximum of 150 percent of their current salary.[3] Eligibility for the VSP depended on three criteria: ten years' service or more; recent performance ratings of "MR" (company shorthand for "meets job requirements") or below, and a salary grade at or above a certain level, which

---

**2.** Ward did not plan to fill the jobs of two VSP plaintiffs, however. Before notifying plaintiff Edwin Casebier of his eligibility for the VSP, Ward informed him it was closing the company's Los Angeles office, where Casebier worked as a national merchandise manager. Casebier Dep. at 36. Similarly, before notifying plaintiff Allyn Casebier, the company's men's suit buyer, of his eligibility for the VSP, Ward told him it was quitting the men's suit business. Iverson

Dep. at 145–46. Ward filled the job of a third VSP plaintiff, Larry Houtz, with an employee older than Houtz. Jackson Dep. at 129–30.

**3.** An alternate method of calculation available to employees between the ages of 55 and 63 based the separation allowance on a percentage of accrued retirement benefits. The 13 VSP plaintiffs received separation payments ranging from $31,732.20 to $125,250.00.

varied among different divisions of the company. Eighty percent of the employees eligible for the VSP were over 40. Report of Whitman Soule at 5.

After receiving notice of their VSP eligibility, employees had 30 days in which to accept or reject the offer. Those who accepted would remain at Ward no longer than 180 additional days, and were required to sign a simple one-page form, in which the last of three paragraphs read as follows:

> I acknowledge that my separation from Montgomery Ward as a result of my participation in the Voluntary Separation Program is voluntary for all purposes under applicable federal and state law and constitutes a complete waiver of all provisions of any compensation practices, either express or implied, between me and Montgomery Ward.

Ward did more than simply formulate the VSP, mail offers to eligible employees, and leave recipients to accept or reject the program on their own. Before distributing each round of offers, company officials reviewed the names of eligible employees and prepared lists indicating which employees should reject the VSP and remain with the company, and which should accept the offer and leave. PX 12 at 276; PX 27; PX 28; PX 39 at 135–36.

The company took pains to let employees know who was to stay and who was to go. In a memorandum to division managers and national merchandise managers dated September, 1981, Pistner directed, "[e]mployee will receive a positive message if their [sic] boss wants them to stay and participate in turnaround." PX 26 at 2. Ward coached supervisors on how to tell employees whether to accept or reject the VSP, suggesting to national merchandise managers during a briefing session on the plan that they use stock phrases such as "We feel you have a future here," "Your career is here," and "You do have an option to stay" in conversations with employees approved for retention, while urging employees whose presence was no longer desired to "seriously consider the offer." PX 29, *passim*. Numerous employees have

testified that they gave or received signals to accept or reject the VSP, PX 12 at 276 *et seq.*; PX 29 at 54–59; PX 33 *passim*; PX 35 at 30; PX 40 at 344–45, 412–17; PX H at 370, 380, 404, and that it was common knowledge among Ward employees that the company would inform employees if it wanted them to stay, PX 38 at 13–14; PX 48 at 158; PX 51 at 40; Mowry dep. at 76–77; Casebier dep. at 28; Rierden dep. at 16.

Ward made it plain in a variety of ways that VSP recipients who did not receive signs to stay had no choice but to leave or face termination without separation benefits. The message came in part from the top of the company. During an August, 1981, meeting between Pistner and national merchandise managers, a participant asked Pistner, "What happens if you are not told to stay and participate in the turnaround but you elect to do so?" Wolfe dep. at 406. Pistner responded, "God forbid that you would do that." *Id.* at 406–07.

At least one VSP recipient, plaintiff John Wolfe, was told directly that he would be fired if he refused to accept the VSP. PX 40 at 345. Other employees, including seven plaintiffs, received blunt messages to accept the VSP and get out of the company. The supervisor of plaintiff Albert Dapolito told him, "Take the program, get out of the company. I will not have you as my merchandise manager." PX 43 at 82. Another of Dapolito's superiors told him he was right to fear he would be fired without warning if he rejected the VSP, *id.* at 244. A company official visited plaintiff Clarence Kuhn's office and told him, "I have been given the assignment to tell you to accept the plan and leave the company." PX 42 at 131. Plaintiff Sterling Nelson's supervisor told him to "take the VSP and resign." PX 47 at 180. Plaintiff Edwin Casebier's boss told him to take the VSP if he received an offer. Casebier dep. at 28. One of plaintiff Thomas Dean's supervisors told him to "take the money up front." PX 46 at 118. Plaintiff Howard Turpin's boss told him, "we suggest that you accept this offer and leave." PX 49 at 138. A company official told plaintiff David Lightfoot

that he "should accept the letter." PX 41 at 169.

The signals to other VSP recipients were more tactful but equally clear. Plaintiff William Sokolick's boss told him that if he was in Sokolick's shoes, he would accept the VSP. PX 48 at 152. The supervisor of plaintiff Larry Houtz summoned Houtz and asked him if he planned to accept the VSP. PX 45 at 157–58, 162–63. Houtz, who had been searching unsuccessfully for a positive sign, *id.* at 178, replied that he felt he had no choice but to do so, *id.* at 163, and his supervisor told him, "if I was your age and the things that are going to go on around here in the next few years, [sic] I would take it, too." *Id.* at 179. Like Houtz, plaintiff Jerry Perkins had been looking unsuccessfully for a sign to stay with the company, and his boss told him, "if you are on the keep list you will know it." PX 51 at 40, 42. Plaintiff Allyn Iverson's boss had repeatedly reassured him that he would have a job with Ward after the company quit the men's suit business. Iverson dep. at 147. When Iverson's VSP offer arrived, however, he received no sign to reject it despite the fact that co-workers in the men's suit department received such signs, *id.* at 169. Plaintiff Norman Nelson knew his boss had encouraged other VSP recipients to stay, and approached him after receiving his own VSP offer. PX 33 at 19–20. When Nelson said he was considering accepting the VSP, his boss encouraged him and said he was doing the right thing. *Id.* at 23.

Under the circumstances, and particularly given the extensive word-of-mouth dissemination of information about the VSP, Ward did not need to explicitly threaten the firing of employees who rejected the VSP without authorization; rather, the company created and maintained an atmosphere in which there was absolutely no doubt in anyone's mind that this would occur. Mowry dep. at 79–81, 144–45; PX 33 at 10–11. One company official even spoke of the VSP in terms ordinarily associated with firings, telling another employee that he was going from office to office delivering "the bad news" to VSP recipients who were not being asked to stay with Ward.

PX 43 at 223. Numerous persons who accepted the VSP testified that they felt they had no alternative but to resign, and that their decisions to accept the VSP were not voluntary. PX 38 at 20, 26; PX 41 at 180; PX 43 at 232; PX 46 at 126; PX 47 at 187; PX 50 at 176. Ward has not identified a single VSP who recipient rejected the offer and stayed with the company without first receiving official encouragement to do so.

## DISCUSSION

### I. *Plaintiffs' Ability to Establish Prima Facie Cases*

#### A. *Constructive Discharge*

■ Ward correctly points out that the VSP plaintiffs must show they were discharged in order to establish prima facie cases of age discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Bartman v. Allis-Chalmers Corp.,* 799 F.2d 311, 314 (7th Cir.1986). Because Ward never expressly fired the VSP plaintiffs, they can establish this element only by proving that Ward constructively discharged them; that is, that it made their working conditions so miserable that reasonable persons in their position would have felt compelled to resign. *Bartman,* 799 F.2d at 314; *Parrett v. City of Connersville, Ind.,* 737 F.2d 690, 694 (7th Cir.1984); *Bernstein v. Consolidated Foods Corp.,* 622 F.Supp. 1096, 1101 (N.D.Ill.1984) (Rovner, J.).

Although the words "intolerable working conditions" call to mind circumstances in which employers subject employees to extreme harassment or physical discomfort, courts have not interpreted the constructive discharge doctrine so narrowly, and have found constructive discharge in a variety of cases where an employer simply made plain its desire to be rid of a particular employee. The case whose facts most closely resemble those here is *Downey v. Southern Natural Gas Co.,* 649 F.2d 302 (5th Cir.1981), in which the court held that the plaintiff could withstand summary judgment on the issue of constructive dis-

charge by showing that he accepted early retirement because his employer denied him a transfer on the basis of his age, and told him he was in danger of being fired without benefits because the company did not want to keep him around until the mandatory retirement age. The court held:

> Downey asserts that his superior specifically advised him that he might be discharged, with a consequent loss of benefits. We regard that testimony as sufficient to create a contested issue of material fact regarding constructive discharge. A reasonable person might well feel compelled to resign in the face of such a statement.

*Id.* at 305. *See also Clark v. Marsh,* 665 F.2d 1168, 1173–74 (D.C.Cir.1981) (finding constructive discharge where employer denied employee opportunities for promotion, transfer, and additional training over period of several years); *Christensen v. Equitable Life Assurance Society of the United States,* 767 F.2d 340, 343 (7th Cir. 1985) (finding constructive discharge where employer offered employee choice of termination or transfer involving relocation and reduction in standard of living).

The evidence in this case is more than adequate to preclude summary judgment in favor of Ward on the issue of constructive discharge. It was common knowledge at Ward that the company wished to rid itself of all VSP recipients other than those it specifically asked to stay, and that under the new management the company was likely to fire any employee who rejected the VSP and stayed without authorization. In light of these circumstances, as in *Downey,* it was reasonable for the VSP plaintiffs to believe Ward would fire them without benefits if they rejected the VSP, and thus to feel compelled to resign. Moreover, while not all VSP plaintiffs may have known that top company officials made derogatory comments about older employees and devised the VSP to reduce the number of such employees, such evidence corroborates plaintiffs' perceptions and thereby supports their reasonableness.

### B. Special Issues Relating to Plaintiffs Casebier, Iverson, and Houtz

In addition to arguing that they were neither actually nor constructively discharged, Ward contends that plaintiffs Casebier, Iverson, and Houtz are unable to make out prima facie cases of age discrimination for other reasons. Specifically, Ward argues that Casebier and Iverson cannot make out prima facie cases of age discrimination because the company eliminated their jobs for legitimate business reasons, and that Houtz cannot make out a prima facie case of age discrimination because he was replaced with an older worker.

### 1. Casebier and Iverson

■ When a plaintiff in an age discrimination case alleges that his employer discriminated against him in the course of eliminating his job, he may make out a prima facie case by showing: 1) that he is within the protected age group; 2) that he was discharged; 3) that he was qualified for another position available at the time of his discharge; and 4) that there is direct or circumstancial evidence from which a reasonable trier of fact could conclude that the employer intended to discriminate in making the decision at issue. *McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 114 (7th Cir.1986).

■ Iverson is able to establish these elements. He is within the protected age group and, like the other VSP plaintiffs, has produced adequate evidence to withstand summary judgment on the issue of constructive discharge. He also has testified that until shortly before he received his VSP offer, his supervisor repeatedly reassured him that there would be a job for him at Ward after the company left the men's suit business, and that Ward asked co-workers in his department to stay with the company. This evidence suggests that Ward had other openings for which Iverson was qualified at the time he accepted the VSP, and is sufficient to create a triable issue of fact. Finally, evidence of age-biased comments by members of Ward's top

management, of the company's intent to use the VSP to promote younger employees, and of the disproportionate impact of the VSP on older employees could lead a reasonable trier of fact to conclude that Ward failed to offer Iverson another position because of his age.

■ Unlike Iverson, Casebier has produced no evidence that Ward had other positions available for which he was qualified at the time he received his VSP offer. Casebier therefore has failed to establish that he lost his job as a result of the VSP program, rather than as a result of the elimination of his job, and has not established a prima facie case of age discrimination.

2. *Houtz*

■ Ward argues that Houtz cannot establish a prima facie case of age discrimination because he was replaced by an older employee. Houtz must show that his age was "a determining factor" in Ward's decision to offer him the VSP, *see Mathewson v. National Automatic Tool Co., Inc.*, 807 F.2d 87, 89–90 (7th Cir.1986). Logic precludes him from doing so if he was replaced by an older worker. *See Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69 (6th Cir.1982) (prima facie case under ADEA requires plaintiff to show replacement by younger person).

II. *Waiver and Estoppel*

As a second line of defense, Ward argues that even if the VSP plaintiffs are able to establish a prima facie case of age discrimination, their signatures on the VSP acceptance form bar this action for one of two reasons: first, the form contains a waiver of "all provisions of any compensation practices, either express or implied, between me and Montgomery Ward," which Ward interprets as a waiver of the signatory's rights under the ADEA; and second, the form declares each VSP plaintiff's separation from Ward "voluntary for all purposes under applicable state and federal law," which, according to Ward, estops plaintiffs from claiming that they were discharged.

■ Ward's initial argument is without merit. The language of the purported waiver refers only to "compensation practices, either express or implied," and whatever "compensation practices" may be, they are not federal employment discrimination laws. Ambiguous or meaningless words are insufficient to waive rights under the ADEA.

■ Ward's second argument also fails. It is settled law that a waiver of rights under the ADEA is effective only if it is "voluntary and knowing." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974); *Bernstein v. Consolidated Foods Corp.*, 622 F.Supp. at 1105–06. The court has already found a material issue of fact with respect to whether the VSP plaintiffs left Ward voluntarily, and the court's reasoning on that question also compels a finding that a material issue of fact exists with respect to whether the VSP plaintiffs voluntarily signed the acceptance forms.

Ward relies heavily on *Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir.1986), for the proposition that a signed, unsupervised release may bar prosecution of an ADEA claim. As the Sixth Circuit itself and other courts have noted, however, the usefulness of *Runyan* is limited because the plaintiff was an experienced labor lawyer familiar with the ADEA, who negotiated a settlement of his age discrimination claim and signed a release which he had no intention of honoring. *See id.* at 1043–44; *Bernstein v. Consolidated Foods Corp.*, 622 F.Supp. at 1106; *EEOC v. United States Steel Corp.*, 583 F.Supp. 1357, 1362 (W.D.Pa.1984). The VSP plaintiffs are not as sophisticated as the plaintiff in *Runyan*, they never negotiated with Ward for the terms of their separation package, and there is no evidence that they attempted to take advantage of Ward by entering into an agreement they never intended to keep. *Runyan* thus is inapposite to this case.

CONCLUSION

For the foregoing reasons, Ward's motion for summary judgment against the

VSP plaintiffs is granted with respect to Edwin Casebier and Larry Houtz, but otherwise denied.

IT IS SO ORDERED.